## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Christina Conti,                                    Civ. No. 22-1579 (JWB/JFD)

               Plaintiff,

v.                                                  **FINDINGS OF FACT,**
                                                    **CONCLUSIONS OF LAW, AND**
The Lincoln National Life Insurance                 **ORDER FOR JUDGMENT**
Company,

               Defendant.

Brenna Karrer, Esq., Joyce Trudeau, Esq., and Zachary Schmoll, Esq., Fields Law Firm, counsel for Plaintiff.

Byrne J. Decker, Esq., and Rachel Shaskos Urquhart, Esq., Ogletree, Deakins, Nash, Smoak & Stewart, PLLC, counsel for Defendant.

Christina Conti filed suit against Lincoln National Life Insurance Company under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Conti claims that Lincoln improperly terminated her long-term disability ("LTD") benefits after determining that she failed to supply proof that her ability to work was limited by any of her diagnosed health conditions, which included fibromyalgia, arthralgia, and small fiber neuropathy. Both parties seek judgment on the administrative record. Conti seeks to reinstate her benefits, and Lincoln seeks to affirm its decision denying benefits.

After reviewing the record, considering the parties' arguments, weighing the evidence, and examining applicable law, it is more likely than not that Conti remained

unable to perform her job in the months after her benefits were terminated. Therefore, Lincoln improperly terminated Conti's benefits and must reinstate her eligibility. It is for Lincoln to resolve whether Conti remains disabled under the benefit plan.

## FINDINGS OF FACT

These Findings of Fact are either undisputed or have been proven by a preponderance of the evidence. To the extent that the Conclusions of Law include any Findings of Fact, they are incorporated here by reference.

The administrative record Lincoln developed to review Conti's claim was filed under seal. (Doc. No. 22.) Citations to that record will be styled as (AR XXX).

## I.   The Parties and the Plan

Plaintiff Christina Conti worked as a Senior Radiation Protection Technician at Veolia North America, which had purchased a disability benefits plan ("the Plan") from Defendant Lincoln National Life Insurance Company. (AR 3–59.) Conti stopped working in March 2019 and applied to Lincoln for short- and long-term disability benefits under the Plan due to "extreme pain" in multiple areas of her body, neuropathy, extreme muscle weakness, and loss of strength. (AR 103.)

To be "disabled" under the Plan, claimants must prove that an injury or sickness prevents them from performing the material and substantial duties of their occupation. (AR 13.) After 24 months, claimants must show they cannot perform the material and substantial duties of "any occupation" that the claimant "is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity." (AR 11, 13.)

The Plan requires claimants to submit proof of their claim within 30 days of the

end of the Elimination Period, if possible. (AR 52.) Proof of continued loss, continued

disability, and regular attendance of a physician must be provided within 30 days of a

request from Lincoln for such proof. (*Id.*; *see also* AR 30.) Lincoln also has the right to

have a claimant examined or evaluated as needed. (AR 50.)

The Plan has a 24-month limit on disability because of mental illness, substance

abuse, or non-verifiable symptoms. (AR 33.) Non-verifiable symptoms are "subjective

complaints to a Physician which cannot be diagnosed using tests, procedures or clinical

examinations typically accepted in the practice of medicine. Such symptoms may

include, but are not limited to, dizziness, fatigue, headache, loss of energy, numbness,

pain, ringing in the ear, and stiffness." (AR 17.)

## II.     Conti's Occupation

Lincoln's vocational analyst determined that Conti's job is most comparable to the

position of radiation monitor. (AR 1740–41.) A radiation monitor is considered a light

duty occupation in the national economy. (*Id.*) The physical demands include lifting,

carrying, pushing, or pulling 20 pounds at times, up to 10 pounds often, or a negligible

amount constantly. (AR 1743.) The position can include walking or often standing, as

well as pushing or pulling of arm or leg controls. (*Id.*)

## III.    Conti's Conditions, Symptoms, and Treatment History

### A.      Initial symptoms, diagnoses, and physical therapy

Beginning in March 2019, Conti stopped work because of complex and rapidly

progressing health issues that caused extreme pain throughout her body. (AR 103.) She

presented to the Cleveland Clinic on April 4, 2019, reporting diffuse pain throughout her

body, rated on the pain scale at an 8/10. (AR 1530.) Her physical exam was largely normal, but Conti reported pain in her back, shoulders, and hips during range of motion testing. (AR 1533–34.) A radiology exam returned essentially normal results. (AR 1546.)

A neurologist's impression on April 10, 2019, was that Conti presented with mild spinal arthropathy, diffuse pain with widespread central sensitization (fibromyalgia), and chronic pain syndrome. (AR 1551.) Conti complained of constant pain of varying intensity in her low back, neck, and right side of her body. (AR 1548.) She again rated the pain at 8/10 on average and reported that walking, lifting, and standing increased her pain. (AR 1549.) The neurologist requested a rheumatology consultation. (AR 1551.)

Conti's treating physician, Dr. Robert Palguta, referred her to rheumatologist Carmen Gota, who examined Conti on May 6, 2019. (AR 1556–59.) Dr. Gota noted Conti's symptoms included joint pains, neck pain, back pain, a constant burning sensation in her feet, headaches, and "horrible" memory and concentration, as well as severe anxiety. (AR 1556, 1559.) While Conti showed normal range of motion and no swelling or deformity, she exhibited tenderness at all 18 points used as diagnostic signs of fibromyalgia. (AR 1559.) Dr. Gota diagnosed Conti with severe fibromyalgia, prescribed medications, and referred Conti for physical therapy. (*Id.*)

At her next visit with Dr. Palguta on May 22, 2019, Conti continued to complain of extensive pain throughout her right side and reported being unable to hold her 8-month-old son. (AR 2083). After reviewing the notes from rheumatology, Dr. Palguta noted "it looks like she has fibromyalgia." (*Id.*) He assessed that Conti was "disabled significantly" and would need long-term disability, but remained hopeful that she could

4

return to work again. (*Id.*) A repeat MRI ruled out a spinal cyst as the cause of Conti's mid-back pain. (*Id.*) Like Dr. Gota, he referred her for physical therapy. (*Id.*)

Dr. Palguta's assessment was the same on July 9, 2019. (AR 2085.) He wrote that Conti's diagnosis "really amounts to fibromyalgia" and that she "warrants longer term disability" for six months, but he remained hopeful she could return to work in the next year. (*Id.*) Conti reported that her pain was contributing to depression. (*Id.*) Dr. Palguta prescribed medication and intended to refer her for psychiatry and counseling. (*Id.*)

Conti began physical therapy on July 11, 2019. (AR 2027–34.) At her initial examination, Conti reported that she used to be very active but physically declined after the birth of her fourth son. (AR 2027.) She reported increased pain, numbness, and tingling since March 2019, that her symptoms increase with activity, and that recently she had been confined to her home and barely able to participate in any activity. (*Id.*) She rated her worst pain level at 10/10, best at 5/10, and current at 7/10. (*Id.*) Her lower extremity functional scale measured at 18/80 (0/80 is most impaired), and her low back pain measured at 66% disabling. (*Id.*) She was scheduled for therapy two or three times a week for the next four weeks, to continue and progress "as tolerated." (AR 2031–32.)

Conti's visit with Dr. Palguta on August 6, 2019, was mostly positive. (AR 2091.) Although her pain was "about the same," she reported improved strength and lessened depression. (*Id.*) She found physical therapy "extremely helpful." (*Id.*) To Dr. Palguta, Conti appeared much better both physically and mentally, and he anticipated she could return to work in January 2020. (*Id.*) Conti had not seen a counselor as Dr. Palguta had recommended but felt she did not need counseling "at this point." (*Id.*)

5

After a month of treatment, Conti's lower extremity function was again 18/80, and her low back pain had slightly increased to 68% disabling. (AR 2007–08.) Her range of motion had improved, but she reported pain and numbness during the tests. (AR 2008–09.) Her therapist assessed her as "progressing well" and feeling stronger but noted she "has persistent pain to her neck, back, and extremities that limit her function, [activities of daily living,] and ability to care for her family." (AR 2009.) The plan remained to continue treatment as tolerated. (AR 2010, 2014.)

Physical therapy notes from August 9 and 13 revealed that Conti's symptoms had increased, perhaps due to increased activity at home. (AR 2011, 2013.) She reported back spasms after therapy on August 6 that continued to worsen. (AR 2013.) At her August 30 visit, Conti continued reporting significant pain in her low back and right hip and added that she was usually more sore after therapy. (AR 1997.)

Conti continued physical therapy through September 3, 2019, where she again reported pain with sitting, standing, walking, using stairs, moving from sitting to standing, and bending. (AR 1995.) Her therapist assessed her as having less pain after treatment and good rehabilitation potential, although her listed problems still included pain, gait, and posture issues, as well as decreased range of motion, strength, function, endurance, and tolerance of functional positions. (*Id.*)

Other records indicate that Conti stopped physical therapy because she found it was increasing, not relieving, her pain. (AR 432, 471.) She told some providers that her physical therapist had advised her to stop. (AR 486, 1567.) But that recommendation is not in the administrative record.

**B.      Specialist visits yield normal results and unremarkable findings**

Conti continued seeing specialists in neurosurgery, neurology, pulmonology,
endocrinology, orthopedic surgery, radiology, and cardiology for the rest of 2019,
throughout 2020, and continuing into 2021. (*See, e.g.*, AR 163–69, 301–03, 485–89, 563–
65, 570–76, 579–82, 635–38, 694, 808–09, 814–17, 1253–56, 1257–59, 1393–96.) The
specialist visit notes largely followed the same pattern. Conti would report her same
ongoing pain symptoms, the specialist would note a normal physical examination, and
then the specialist would conduct testing that revealed nothing abnormal to explain
Conti's symptoms. (*See, e.g.*, AR 190, 260–65, 269–73, 276, 301, 358, 489, 519, 809,
1170–71.) When asked to complete work restrictions paperwork by Lincoln, most doctors
declined to return the forms. Some declined to impose work restrictions based on their
assessments in their specialties. (AR 1250, 1402.) Others did not measure her physical
limitations (AR 1170) or deferred to Dr. Palguta on work restrictions and did not
comment. (AR 1388.) Yet, no specialist expressly authorized a return to work.

**C.      Findings from Dr. Palguta, Conti's rheumatologists, and others
           confirm some underlying conditions**

Dr. Palguta was the only provider to restrict Conti from work, consistently citing
her fibromyalgia as the likely cause of her symptoms and physical limitations. Conti
visited Dr. Palguta regularly throughout 2020 and 2021, and he wrote notes keeping her
out of work and filled out restrictions forms for Lincoln in February, March, April, and
June 2020, and in January, November, and December 2021. (AR 219–21, 225–26, 858,
1119–22, 1166–67, 1368–71, 1379–82, 1546.) The visits followed the same pattern as her

visits in 2019. Conti would describe the current state of her pain, numbness, and fatigue, as well as their effect on her daily activities, her physical exam would be largely unremarkable, and then she and Dr. Palguta would discuss her diagnoses and next steps for treatment, medication, or specialist referrals.

Dr. Palguta's consistent opinion was that Conti could not work due to her fibromyalgia, back pain, and other chronic conditions. The only outlier is his May 2021 restrictions form, which checked a box to indicate that Conti could do light duty work. (AR 1119–20.) That said, Dr. Palguta expressed later that he did not approve light duty work, writing both that the authorization "is not in my note" and that he could not see Conti working at all due to her multiple issues as outlined by multiple specialists. (AR 221.)

Conti also saw Dr. Sara Levy from General Medicine at Alleghany General Hospital for one visit on February 26, 2020. (AR 628–32.) Like Dr. Palguta, Dr. Levy found Conti positive for arthralgias, back pain, and neck pain, although her physical examination was normal with no joint swelling and normal range of motion. (AR 628–31.) Dr. Levy noted fibromyalgia as Conti's primary diagnosis and that Conti presented "a very difficult case." (AR 632.) She found Conti's perception of pain was "significant" and recommended massage therapy, cognitive behavioral therapy, stress management, and increased physical activity, which Conti resisted because it made her "veins burst." (*Id.*) Dr. Levy declined to fill out disability paperwork, which Conti understood. (*Id.*)

Conti visited rheumatologist Dr. Holly Lowther in June 2020, February 2021, April 2021, and October 2021. (AR 310–316, 432–33, 465–72, 546–52.) Conti

consistently reported her symptoms and limitations at each visit, and Dr. Lowther found that her reports of pain and fatigue that are out of proportion to physical findings pointed to fibromyalgia. (AR 471.) Dr. Lowther recommended that Conti undergo a QSART (a test of her nerves that control sweating) to evaluate her leg pain, which was conducted by a neurologist on April 1, 2021. (AR 431.) The results suggested small fiber abnormalities in Conti's left leg. (*Id.*)

Dr. Lowther's rheumatology colleague, Physician Assistant Jennifer Beck, reviewed the results of Conti's QSART and other specialist exams at a follow-up appointment. (AR 428–36.) Ms. Beck noted that Conti continued reporting diffuse pain without major physical exam findings, that "her symptom complex does suggest fibromyalgia," and that Conti "has had worsening pain with physical therapy." (AR 432– 33.) She also wrote that Conti "does have small fiber neuropathy" based on the recent QSART. (*Id.*) She discussed Conti getting a physical evaluation of her mid-back pain and recommended that Conti slowly increase exercise. (*Id.*)

A neurological follow-up in June 2021 noted that Conti's reported symptoms fit fibromyalgia and small fiber neuropathy as detected on her QSART. (AR 817.) The provider noted that Conti's extensive rheumatological labs were unrevealing and "strongly recommended formal neuropsychological testing," but Conti declined. (*Id.*)

### D.  Conti's ailments persist into fall 2021

On August 29, 2021, Conti went to the emergency room reporting severe back pain, although her physical examination was normal. (AR 742–48.) The attending doctor noted that Conti was fixated on prior abnormalities from a 2019 MRI, which she advised

9

were not of concern according to imaging conducted that day. (AR 748.) Conti grew

upset in response to being advised to follow up with pain management because "everyone

keeps telling me to see psychiatry and pain medicine and no one believes that I have a

mass on my spinal cord." (*Id.*) Conti was discharged in stable condition with instructions

to follow up with Dr. Palguta and Pain Medicine. (*Id.*)

Conti returned to Dr. Palguta on November 16, 2021. (AR 219.) Dr. Palguta noted

that Conti was "doing about the same," that she reported her depression and anxiety were

a non-issue, and that her main complaint again was persistent pain everywhere. (AR 219–

20.) Dr. Palguta summarized Conti's recent specialist visits and said he had reviewed

those notes, before repeating that Conti "does not have any definitive diagnosis from the

rheumatologist . . . other than fibromyalgia, neuropathy, and chronic pain syndrome."

(AR 220.) Dr. Palguta wrote that Conti "continues to be unable to do really anything,"

and that she "still is unable to perform any significant work." (AR 220–21.)

On December 2, 2021, Dr. Palguta completed an updated restrictions form that did

not check any box that Conti was capable of performing work. (AR 858.) The form listed

neuropathy, chronic pain syndrome, and fibromyalgia as Conti's conditions, and

specified that restrictions were imposed from May 7, 2021 to "unknown." (*Id.*)

## IV.    Lincoln's Benefits Determinations

### A.    Short-term disability ("STD") granted

Lincoln first approved Conti's STD claim, finding that she was disabled as of

March 13, 2019, and began paying her monthly. Lincoln terminated the claim and

stopped payments, however, after it requested but did not receive medical records from

Conti's providers. (AR 2046, 2074–75, 2123–26.) Conti appealed the denial and supplied the missing records. (AR 2109.) Upon review, Lincoln reinstated Conti's STD benefits until September 10, 2019, when the STD benefit period ended. (AR 1781–83.)

### B.    Long-term disability ("LTD") granted

On November 8, 2019, Lincoln approved Conti's LTD claim, effective September 11, 2019. (AR 60, 1750, 1752–54.) The approval letter informed Conti that Lincoln had determined she was disabled from low back pain and unable to perform the duties of her occupation. (AR 1751–52.) The letter also noted that Conti had been diagnosed with anxiety and depression, that Lincoln would be requesting additional information to assess her restrictions and limitations related to that diagnosis, and that those conditions were subject to the 24-month non-verifiable symptoms limitation. (AR 1752.) The letter then explained that Lincoln will continue to review Conti's claim and request medical documentation to evaluate her benefits eligibility, that it was "imperative" for Conti to promptly respond to Lincoln's requests for information, and that she should notify Lincoln immediately if her condition changes or her physicians alter her treatment. (*Id.*)

Lincoln internally recorded Conti's LTD claim end date as September 10, 2021, based on the "24 months own occupation" standard. (AR 1713.)

### C.    Lincoln requests updated medical records

Lincoln began requesting updated medical records from Conti in December 2019, but extended her deadline to supply the records and continued awarding her benefits throughout 2020. (AR 77–86, 1359, 1445, 1515, 1656, 1697) Lincoln also requested updated records and forms directly from Conti's providers throughout 2020. (AR 1262–

69, 1334–47, 1421–40, 1448, 1472–77, 1503–12, 1668, 1693.)

When extending Conti's claim, Lincoln representatives continually noted Conti's fibromyalgia and low back pain; findings from Dr. Palguta, Dr. Lowther, and her other providers as those records became available; delays and closures because of COVID-19; as well as Conti's ongoing follow-up with specialists. (AR 77–83.) On September 10, 2020, Lincoln determined that based on Conti's available medical records, less than sedentary restrictions were supported for 6 months from her last rheumatology visit to see specialists, complete testing, and evaluate further treatment. (AR 79.)

In January 2021, Lincoln wrote to Conti informing her that she must be disabled from any occupation to remain eligible for LTD benefits starting September 11, 2021. (AR 1219.) Lincoln requested that she provide updated records and complete certain forms by February 20, 2021. (*Id.*) Lincoln wrote a similar letter to Conti on May 1, 2021, requesting the updated forms and records by June 15, 2021. (AR 1152.)

Lincoln also requested updated records and restrictions forms from Conti's providers that spring but received no responses. (AR 949–1079, 1127–49.) Lincoln sent Conti two letters in June 2021 reminding her of the request for updated provider records, ultimately setting a submission deadline of July 7, 2021. (AR 1031, 1105.)

Only Dr. Palguta eventually responded to Lincoln, providing the note from Conti's May 3, 2021 visit and the May 12, 2021 restrictions form that checked the box indicating that Conti was capable of performing light work duties. (AR 1119–20.)

### D.     Lincoln suspends Conti's benefits eligibility in July 2021

On July 23, 2021, Lincoln suspended Conti's benefits effective July 21, 2021,

citing the failure to receive updated records from providers other than Dr. Palguta. (AR 974.) Lincoln advised Conti that her claim file would remain open for her to submit updated records until August 20, 2021. (*Id.*)

### E.    Dr. Broomes reviews Conti's benefits eligibility

In September 2021, Lincoln hired Dr. Stephen Broomes to review Conti's claim file. Dr. Broomes reviewed Conti's records and determined that she no longer met the definition of disabled under the Plan because "the objective clinical findings are insufficient to support a functional impairment from current to ongoing that would adversely affect the claimant's ability to work." (AR 925.) Dr. Broomes also noted the normal and non-significant test and exam findings in Conti's file, as well as the May 2021 note from Dr. Palguta that "placed her on light work duties from 05/07/2021 to 05/04/2022 secondary to anxiety, depression, edema, and fibromyalgia." (*Id.*)

Lincoln informed Conti of the result by letter, explaining that her claim would be closed and that she had the right to appeal the outcome. (AR 915–16.) Lincoln directed Conti to include the following documentation in any request for review:

> All office visit notes, treatment notes, physical therapy records, diagnostic test results and all other medical documentation from March 1, 2019 through the date of appeal that would preclude you from performing the duties of any occupation from Dr. Palguta, Dr. Lowther, Dr. Small, Dr. Dumont, Dr. Gota, Dr. Khalaf, Dr. McGann, Dr. Maleki, Dr. Baghai and all other treating providers not listed.
>
> You should also provide any additional information that you feel will support your claim.

(AR 916.)

### F.     Dr. Oldham upholds termination of benefits on appeal

Conti appealed on December 2, 2021. In support, she submitted a new restrictions form from Dr. Palguta and more medical records later in December. (AR 173, 858–59.) Lincoln contracted with Dr. Karen Oldham to review Conti's claim file. (AR 64, 157–69.) Dr. Oldham reviewed Conti's records and contacted Dr. Palguta by phone, reporting that "Dr. Palguta states all restriction recommendations were based on self-reported symptoms; she has seen many specialists and he is basing all [restrictions and limitations] on their reports and her symptoms." (AR 158.) Dr. Oldham also noted that Dr. Palguta "confirmed that he saw no abnormalities on exam, but felt [Conti] had significant self-reported symptoms." (AR 162.) Dr. Oldham disagreed, finding that Conti's normal physical examinations and MRI results did not support work restrictions. (AR 160–62.) She also opined that the severity and scope of Conti's reported symptoms were inconsistent with the severity and scope of her medical conditions:

> The claimant reports severe mid-back pain, but MRI of the spine is normal. She reports severe joint pains and has tenderness to palpation, but has no objective synovitis, and the rheumatologist diagnosed only "arthralgia of multiple joints". Her PCP also reports that she has many symptoms, but no abnormalities on physical exam.

(AR 159.) Dr. Oldham concluded that Conti's "claimed conditions of mid back pain and arthralgia at multiple sites are not impairing." (*Id.*) Her report does not mention Conti's fibromyalgia.

Lincoln invited Conti to respond to Dr. Oldham's report, but she did not. (AR 142–43.) Lincoln accepted Dr. Oldham's findings and issued a letter denying Conti's appeal on January 31, 2022. (AR 130–40.) It gave this explanation:

14

We conducted a thorough and independent review of your entire claim. In summary, we acknowledge that you may have continued to experience some symptoms associated with your condition beyond July 21, 2021. However, the information does not contain physical or mental status exam findings, diagnostic test results or other forms of medical evidence supporting your impairments and symptoms remained of such severity, frequency and duration that they resulted in restrictions or limitations rendering you unable to perform the duties of your occupation after that date.

Having carefully considered all of the information submitted in support of your claim, our position remains that proof of your continued disability in accordance with the Policy provisions after July 21, 2021 has not been provided. Therefore, no further benefits are payable.

(AR 136.)

## V.    Other Findings of Fact

On September 26, 2020, the Social Security Administration ("SSA") awarded Conti disability benefits retroactively beginning in September 2019. (AR 1244–47.) The SSA found Conti became disabled on April 1, 2019, and remained disabled for five months, entitling her to benefits. (AR 1244.) As of October 2021, Conti reported to Lincoln that she was still receiving SSA payments. (AR 898.) The administrative record does not include any evidence from the SSA other than its letters to Conti.

The administrative record also does not contain evidence that any provider who personally examined Conti believed she was unreliably reporting her symptoms or that her symptoms lacked credibility. Nor is there evidence that any provider who personally examined Conti affirmatively cleared her to return to work.

## VI.    Procedural History

After Lincoln denied her appeal, Conti filed this ERISA lawsuit on June 16, 2022.

(Doc. No. 1.) She seeks a declaration that she meets the Plan's definition of disability and is therefore entitled to benefits. The parties cross-moved for judgment on the administrative record under Fed. R. Civ. P. 52. (Doc. Nos. 21, 25.) The parties appeared for a hearing on the cross-motions on December 20, 2023. (Doc. No. 44.)

## CONCLUSIONS OF LAW

### I.     Legal Standard

Both sides indicate that Lincoln's LTD benefits decision is to be reviewed de novo. Under that standard, the district court acts as the fact finder, resolving factual disputes, making credibility determinations, and weighing the evidence against the governing policy. *See Avenoso v. Reliance Std. Life Ins.*, 19 F.4th 1020, 1026 (8th Cir. 2021). Conti bears the burden of proving by a preponderance that she is entitled to payment of LTD benefits under Lincoln's ERISA plan. *See Farley v. Benefit Tr. Life Ins.*, 979 F.2d 653, 658 (8th Cir. 1992).

Upon review, sufficient evidence shows that Conti remained disabled under Lincoln's Plan as of July 21, 2021, and in the months that followed.

### II.    Analysis

#### A.     Disability determination

De novo review begins by examining the plan documents, giving the language its ordinary meaning, and reading each provision consistently with the plan as a whole. *Proctor v. Unum Life Ins. of Am.*, Civ. No. 20-2472 (JRT/DTS), 2022 WL 4585278, at *13 (D. Minn. Sept. 29, 2022) (citing *Kitterman v. Coventry Health Care of Iowa, Inc.*, 632 F.3d 445, 448 (8th Cir. 2011)).

16

The parties agree that a claimant is not disabled under Lincoln's Plan simply because they have a diagnosed medical condition. *See Johnson v. G & K Servs., Inc. Long Term Disability Plan*, Civ. No. 15-3789 (WMW/KMM), 2017 WL 9274764, at *6 (D. Minn. Sept. 27, 2017) (citing *Green v. Union Sec. Ins.*, 646 F.3d 1042, 1053 (8th Cir. 2011)). The parties disagree, however, over what proof must be provided to show that a diagnosed condition limits the claimant's ability to work.

The Plan requires claimants to supply proof that they cannot perform their "own occupation" for the first 24 months of benefits. (AR 13.) To claim disability after that time, claimants must prove they cannot perform "any occupation." (*Id.*) Lincoln contends that the Plan requires claimants to supply continuous proof of their inability to work. But the Plan language does not include such a requirement.

The closest the Plan comes to any such requirement is in the "Disability Benefit" section, which provides that benefits will be paid if the claimant gives proof of continued disability, which "must be given upon . . . request and at the Covered Person's expense." (AR 30.) Read in context, the phrase "gives proof of continued disability" does not equate to a requirement to provide proof on a continual basis. Instead, proof must be provided once Lincoln requests it, and benefits will be paid only for the time period for which the proof shows continued disability. This reading is consistent with the "Notice and Proof of Claim" provision, which requires a claimant to supply "proof of continued loss, continued Disability or Partial Disability" within 30 days of a request from Lincoln for the proof. (AR 52.) The Plan does not require a claimant to supply proof on an ongoing basis.

This understanding of the Plan matters here because Lincoln never told Conti what proof of her physical limitations she failed to supply. After telling Conti that Dr. Broomes recommended denying her claim because work restrictions were not supported by the medical records, Lincoln advised her to include "all other medical documentation" that would preclude her from working or that she "feel[s] will support" her claim, should she seek further review. (AR 916.) Conti then sought further review and submitted her most recent medical records and a letter from her treating physician stating that she could not work. Lincoln's generic guidance could reasonably lead Conti to believe that such documentation would suffice.

Lincoln also did not require Conti to undergo a functional capacity or similar examination of her physical abilities, even though the Plan authorizes such a demand and Conti's refusal would be grounds to terminate her claim. It is not Lincoln's duty to prove Conti's claim. But Lincoln's choosing not to examine her functional capacities for itself when it could have done so, having assessed her physical condition, while declining to tell Conti that functional capacity testing was the kind of proof Lincoln wanted was not reasonable under the circumstances and weighs against denying benefits. *See Pralutsky v. Metro. Life Ins.*, 435 F.3d 833, 839–40 (8th Cir. 2006) (finding benefits denial reasonable in part because "the nature of the evidence MetLife was seeking" was brought to the claimant's attention in specific communications telling her to provide treatment records that indicate her restrictions and limitations); *Johnson v. Metro. Life Ins.*, 437 F.3d 809, 812, 814 (8th Cir. 2006) (upholding a request for objective evidence because MetLife informed claimant that his file lacked objective evidence of a physical functional capacity

18

impairment and that his self-reported complaints without objective medical findings of documented functional impairment were insufficient).

Lincoln's insistence on objective evidence is also questionable because Conti's medical records already included her 18/18 trigger point exam result, which is accepted as objective evidence supporting a claim of disabling fibromyalgia. *Chronister v. Baptist Health*, 442 F.3d 648, 656 (8th Cir. 2006) (recognizing that trigger point test findings consistent with fibromyalgia constitute objective evidence of the disease); *cf. Torgeson v. Unum Life Ins. of Am.*, 466 F. Supp. 2d 1096, 1129–30 (N.D. Iowa 2006) (plan administrator abused discretion by demanding objective evidence to support fibromyalgia claim, when claim was already supported by adequate objective medial evidence in the form of "trigger-point" verification).

Lincoln impermissibly converted Conti's disability process into a "guessing game." Rather than specifying that functional capacity testing was what it wanted, or undertaking the testing itself, Lincoln opted to be vague in its interactions and then used that lack of functional capacity evidence to deny Conti's claim for disability (though her records already included objective evidence relating to fibromyalgia).

Ultimately, the outcome of this case depends on the diagnoses and reports in the record—especially those relating to Conti's primary fibromyalgia diagnosis, Conti's reported ability to function, pertinent credibility assessments, Lincoln's prior awarding of benefits to Conti, and Conti's past receipt of social security benefits.

### 1.    Relevant medical records

Conti is diagnosed with fibromyalgia, small fiber neuropathy, and arthralgia at

multiple sites. She was diagnosed with severe fibromyalgia by a rheumatologist using the appropriate diagnostic criteria. Her abnormal QSART result suggested small fiber neuropathy. And her arthralgias were consistently recognized visit after visit. The question is whether Conti's records show that, as of July 21, 2021, she was physically unable to perform light duty work. Based on the medical records relating to her primary diagnosis of fibromyalgia, the answer is yes.

Fibromyalgia is recognized as chronic inflammation of fibrous and connective tissue that causes "long-term but variable levels of muscle and joint pain, stiffness, and fatigue." *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003) (citing Jeffrey Larson, *Fibromyalgia*, *in* 2 *The Gale Encyclopedia of Medicine* 1326–27 (Jacqueline L. Longe et al. eds., 2d ed. 2002)); *see also Morgan v. UNUM Life Ins.,* 2002 WL 31095391, at *1 n. 1 (D. Minn. Sept. 16, 2002) (quoting Simeon Margolis, M.D., Ph.D. & John A Flynn, M.D., *The Johns Hopkins White Papers* 89 (1995)). It is usually diagnosed after eliminating other conditions, although it no longer requires ruling out every other potential cause. *Brosnahan*, 336 F.3d at 672 n.1; *see also* Dr. Christopher Aakre, *Mayo Clinic Q and A: How is fibromyalgia diagnosed?*, Mayo Clinic (Jun. 7, 2019) (available at https://newsnetwork.mayoclinic.org/discussion/mayo-clinic-q-and-a-how-is-fibromyalgia-diagnosed/). It is an "elusive and mysterious disease," with no known cause, no cure, and subjective symptoms. *Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir. 1996). People with fibromyalgia often take many tests and visit many specialists in search of answers. *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech. Inc.*, 125 F.3d 794, 796 (9th Cir. 1997).

As Dr. Lowther explained, Conti's chronic pain and fatigue being disproportionate to her physical findings and activity levels *suggest* fibromyalgia. *See* Aakre, *supra* ("One of the hallmarks of fibromyalgia is pain out of proportion to the degree of tissue injury."). Conti showing 18/18 tender points in April 2019 but only 4/18 in June 2020 does not undermine her condition. *See id.* (explaining that fibromyalgia symptoms come and go over time). Conti's normal physical exams and unremarkable specialist results do not refute her condition or indicate that Conti is exaggerating her problems. It is ordinary for people with fibromyalgia to take many tests and visit specialists in various fields in search of answers for their chronic pain. Normal test outcomes merely rule out other potential causes of her symptoms, while reinforcing fibromyalgia as the root cause.

Fibromyalgia is known to manifest in variable, self-reported, unverifiable symptoms, which no provider medically denied or found Conti to be misrepresenting. In fact, Conti was repeatedly prescribed medications to address her reported symptoms, which she consistently described in terms of their effect on her physical abilities. It is reasonable to conclude, as Dr. Palguta did, that Conti's reported physical limitations would apply both at home and in the workplace.

Conti was not cleared to work by any physician that personally examined her. At most, some providers said that no restrictions were warranted relating to their field of specialty. Other doctors deferred to Dr. Palguta as the treating physician. Dr. Palguta consistently opined that Conti's conditions prevented her from work.

Ultimately, whether Conti remained disabled as of July 21, 2021, hinges on her job's physical demands, which include moving loads of up to 20 pounds, frequent

walking, or standing, and pushing or pulling controls with her arms or legs. Conti often struggles to do any physical activity without pain, numbness, or weakness. At times, her symptoms confine her to bed or limit activities like grocery shopping and caring for her own hygiene. She cannot stand, sit, or lay in the same position over a long time. The few activities she can perform exhaust her and exacerbate her pain. Such limitations at home would also prevent her from performing a job that requires standing, walking, and pushing or pulling weighted objects throughout the day.

The absence of a functional capacity examination is not outcome determinative here, although it would bolster either side's case. To be useful, a functional exam would have to account for the difficulty of Conti's case, as her primary diagnosis is a disease prone to flare-ups and varying symptomology, manifesting through her subjective perception of pain. Weighing the totality of evidence in the administrative record here, Conti's fibromyalgia, multiple arthralgias, and small fiber neuropathy, her repeated reports of symptoms and limitations consistent with those conditions, and Dr. Palguta's years-long acceptance of Conti's reports as precluding her ability to work make it more likely than not that Conti remained unable to perform her job as of July 21, 2021.

### 2.    Conti's credibility

Conti's credibility is central here, as she is the primary source for her symptoms and physical limitations. Most notably, none of her providers found her to be not credible. Some noted a possible psychological component to her symptoms, but as Dr. Palguta recognized, Conti's mental wellness depended on her physical condition. Dr. Small also saw a connection, noting that Conti expressed "extreme dysphoria about her

condition." (AR 638.) Records indicate that Conti struggled to accept the fibromyalgia diagnosis and grew frustrated over the lack of a clear answer and repeated advice to seek treatment she felt had not helped.

Lincoln primarily faults Conti for declining psychological treatment and stopping physical therapy. But as Lincoln recognized in its denial letter, Conti stated that her anxiety and depression had been under control, that she was no longer taking medications for those conditions, and that those conditions had never affected her ability to work. (AR 131.) None of Conti's providers opined that her mental condition was the reason she could not work.

As for physical therapy, Conti's representation that the treatment increased her symptoms is not lacking in support. Although she felt some relief during or immediately after treatment, she continued to report pain that limited her ability to function at home and began reporting back spasms and pain after her appointments in August 2019. The symptoms Conti reported to physical therapy persisted just the same after she stopped attending. The treatment plan was always to continue physical therapy as tolerated. Conti reported several times that she could no longer tolerate physical therapy. Conti's separate reports that her physical therapist told her to stop treatment are not confirmed in the record. But her continued reports of physical activities causing increased pain and fatigue reinforce that the demands of physical therapy caused her pain.

That Conti went camping in 2020 or traveled to see providers in different states does not show she could sustain that level of activity continuously. *See Kaminski v. UNUM Life Ins. of Am.*, 517 F. Supp. 3d 825, 864 (D. Minn. 2021) (reasoning that a trip

to Europe or a visit to a family cabin do not indicate an ability to work a sedentary job) (citations omitted). Conti took her prescribed medicines, routinely followed up with specialist referrals, and tried some anti-smoking measures. Although Conti failed to stop smoking and start exercising, those failures better refute the cardiopulmonary test showing she had reduced exercise capacity. (AR 254–55.) Conti stopped that exercise test after 10 minutes because of leg pain, which is consistent with her prior reports and reinforces why she avoided physical treatment.

Conti pursued an explanation for her symptoms and was receptive to some treatments. Her failure to follow every recommended treatment is not so detrimental to her credibility that her years-long reports of ongoing, debilitating symptoms consistent with her diagnoses should be disregarded.

### 3.    Dr. Palguta's credibility

Dr. Palguta is also credible. He did not merely recite Conti's self-reported symptoms and limitations; he recorded them as part of his analysis that she could not return to work. He did not dismiss her reports as "phantom pains" or lacking medical support; he assessed them alongside the rest of her records and his impressions of her as a patient to decide whether she was capable or incapable of working at the time.

Dr. Palguta's restrictions forms are not particularly detailed, and he conceded that he is uncertain how to complete disability forms. Even so, those issues relate more to the superficial quality of his paperwork than the substantive quality of his medical assessments. As a treating physician, he is better situated to assess Conti's credibility and to evaluate whether the physical limitations she reported warranted issuing an opinion

that she cannot work. *See Kaminski*, 517 F. Supp. 3d at 865 (citation omitted). His written notes do not detail how fibromyalgia limits Conti's ability to work because he understands how the disease presents and its connection to her reported symptoms. He also continually cross-references records from Conti's specialists, including her rheumatologists, as further support for his assessment. Dr. Palguta consistently writes that unless the specialists find something different, his assessment is that Conti's diagnoses and attendant symptoms prevent her from working.

Dr. Palguta being the only physician to impose a work restriction does not indicate bias or lack of rigor. Dr. Levy, the only other general practitioner to examine Conti, reported the same findings and primary diagnosis of fibromyalgia. And there is no evidence Conti was referred to any specialist specifically to consider work restrictions. Dr. Palguta, as the primary care provider, was the main source for restriction determinations, while the specialists focused on their separate areas of medical expertise. Combined with his understanding of the records and encounters with Conti over the years, Dr. Palguta's consistent opinions that Conti could not work are sufficiently reliable.

Lincoln criticizes Dr. Palguta as inconsistent because his May 12, 2021 restrictions form checked a box to indicate Conti was capable of light duty work. But Dr. Palguta clarified in his November 2021 note that he did *not* authorize Conti to work in May 2021. The May 2021 form deviates from all of his other restrictions forms without any explanation for the change. Dr. Palguta's notes from Conti's May 3, 2021 visit indicate that her fibromyalgia persists, and that although Conti had been doing well for a

25

few visits, that was no longer the case. (AR 1122.) That visit note does not indicate Conti had improved to the point she could work. The medical records from immediately before and after May 2021 also do not indicate improvement in Conti's symptoms or abilities. She continued reporting the same symptoms and limitations to rheumatology in April 2021 and to neurology in June 2021. Given Dr. Palguta's otherwise consistent opinion and no recorded basis to change it, the May 2021 check mark is more consistent with an error, which Dr. Paluguta addressed by correcting his December 2021 restrictions form to impose restrictions on May 7, 2021.

### 4.   Analysis from Dr. Broomes and Dr. Oldham

Although this analysis gives no deference to Dr. Broomes and Dr. Oldham, the credibility of their analysis remains relevant as Lincoln accepted their opinions.

Their most glaring flaw is that neither analyzed the condition fibromyalgia, overlooking Conti's primary diagnosis and its crucial context for her reported symptoms and limitations. *Cf. Willcox v. Liberty Life Assurance. Co. of Boston*, 552 F.3d 693, 701 (8th Cir. 2009) ("A plan administrator abuses its discretion when it ignores relevant evidence."); *Norris v. Citibank, N.A. Disability Plan (501)*, 308 F.3d 880, 885 (8th Cir. 2002) (administrator abused discretion when it "seized upon equivocal statements" from the claimant's primary care physician regarding ability to work and otherwise failed to address the "extensive medical evidence" relating to claimant's disability and "consistent conclusions of her doctors" that she could not work). Dr. Broomes and Dr. Oldham opted instead to declare that Conti's records lacked a sufficient basis for work restrictions.

Essentially, Lincoln's doctors disagreed with Dr. Palguta without assessing the

primary condition, related symptoms, and resulting physical limitations that he had routinely assessed and accepted as the basis for his opinion. Plan administrators need not defer to treating physicians, but subjective symptoms like pain may be best evaluated by the physician who assesses the claimant in person regularly. *See Kaminski*, 517 F. Supp. 3d at 862 (collecting cases); *cf. Collins v. Cont'l Cas. Co.*, 87 F. App'x 605, 607 (8th Cir. 2004) ("[A] plan administrator may not deny benefits simply because the only evidence of a disabling condition is subjective evidence."). Under the circumstances, Lincoln, and its doctors should have offered a more complete justification for disregarding Dr. Palguta's opinions.

Conti was diagnosed with severe fibromyalgia in early May 2019 after reporting extensive pain throughout her body and exhibiting tenderness at all 18 points on the trigger response test—a result consistent with fibromyalgia. Conti's treating physician and rheumatologists credited her self-reports, recognized her symptoms as consistent with fibromyalgia, and prescribed her medicine for the symptoms she reported as interfering with her ability to function. None of her treaters raised a concern that she was fabricating or exaggerating her symptoms to obtain benefits. The doctor that most regularly saw Conti in person consistently found her unable to work, based on his review of her medical records and understanding of her presenting diagnoses.

By failing to address Conti's primary diagnosis, Dr. Broomes and Dr. Oldham failed to appreciate, as Dr. Palguta and Dr. Lowther did, that Conti's history of normal and unremarkable examination results reinforced fibromyalgia as the likely culprit. *Cf. Payzant v. UNUM Life Ins. of Am.*, 402 F. Supp. 2d 1053, 1065 (D. Minn. 2005) (benefits

27

denial not supported because no evidence contradicted or refuted the extent to which the claimant suffered from fibromyalgia and claim administrator relied on lack of objective evidence to decide a largely subjective illness); *Willcox*, 552 F.3d at 701 ("[E]liminating one potential cause of a claimant's disability may be insufficient to deny a claim if the symptoms are otherwise credible and other potential causes exist."). Failing to contextualize Conti's records against her primary diagnosis and instead relying primarily on normal exam findings and a lack of objective testing to deny benefits is a significant weakness in Dr. Broomes's and Dr. Oldham's analysis, and weighs against upholding Lincoln's benefits determination.

The lack of objective capacity testing and the presence of normal exam results is not fatal to Conti's claim. The normal results reinforce fibromyalgia as the likely cause of Conti's reported symptoms and limitations. There is thus not a sufficient reason to disregard Conti's reports of symptoms and limitations consistent with her diagnosis.

### 5.   Conti's Social Security Disability Insurance award

Conti's award of disability income from the Social Security Administration weighs in her favor. While the SSA's disability determination is not binding, it is admissible evidence that supports an ERISA claim for LTD benefits. *See Avenoso*, 19 F.4th at 1027 (quoting *Riedl v. Gen. Am. Life Ins.*, 248 F.3d 753, 759 n.4 (8th Cir. 2001)). The SSA found Conti disabled in September 2019, and Conti continued receiving those payments through at least October 2021. To award benefits, the SSA would have found Conti unable to perform her previous work and any other substantial gainful work. *See* 42 U.S.C. § 423(d)(2)(A). The effect of the SSA award is somewhat limited, however,

28

without comparing the record reviewed by the SSA to the materials reviewed by Lincoln. That said, the fact that Conti met the SSA's heightened "any gainful work" standard and remained eligible past when Lincoln found she failed to meet a lower "own occupation" standard supports awarding benefits.

### 6.   Previous benefits awards from Lincoln

The parties disagree about how much weight to afford Lincoln's previous awards of STD and LTD benefits to Conti. Their disagreement turns on *McOsker v. Paul Revere Life Ins.*, where the Eighth Circuit reasoned that a past award of benefits does not bind the insurer forever, but weighs against a decision to discontinue benefits unless the available information significantly changes. 279 F.3d 586, 589 (8th Cir. 2004). The events between the decision to award benefits and the decision to terminate them must be considered. *See Kaminski*, 517 F. Supp. 3d at 859–60 (citing *McOsker*, 279 F.3d at 590).

This circumstance weighs in Conti's favor. Dr. Palguta consistently found Conti could not work outside the May 2021 restrictions form that he later clarified was not meant to authorize a return to work. And there is no record that any other doctor imposed or removed a work restriction on Conti.

More importantly, the information relating to Conti's fibromyalgia did not significantly change from 2019 to July 2021. Lincoln found that less than sedentary restrictions were warranted and awarded benefits throughout 2019 and 2020 based in part on Conti's fibromyalgia and her self-reports reflected in Dr. Palguta's work restriction forms and office notes. Although Lincoln received updated records showing normal physical exams, unremarkable specialist findings, and updated MRI imaging that showed

no disabling spinal issue, those records do not minimize or resolve Conti's fibromyalgia, which was consistently recognized as her primary diagnosis. Conti's reported limitations also remained consistent. Her pain often rendered her unable to stand, sit, walk, or do many other activities without experiencing enduring pain and fatigue after the exertion.

Finally, at no point before July 2021 did Lincoln deny benefits based on a lack of objective evidence measuring Conti's ability to perform the physical demands of light duty work. In fact, Lincoln continued to award benefits without it. To later insist on that evidence when benefits were previously awarded without the need for it undercuts Lincoln's position and weighs against denying benefits. *See Proctor*, 2022 WL 4585278, at *15 (citing *Roehr v. Sun Life Assurance Co. of Canada*, 21 F.4th 519, 526 (8th Cir. 2021)).

Accordingly, considering all the circumstances, Lincoln lacked sufficient basis to deny Conti's LTD benefits eligibility as of July 21, 2021. Lincoln must award Conti the benefits she was entitled to under the "own occupation" disability standard.

### B.    Remand and continuing benefits

Having found Lincoln lacked a sufficient basis to deny Conti's LTD benefits as of July 21, 2021, the next question is what happens after that date. ERISA allows courts to clarify rights to future benefits under the governing plan and issue future payments. *Proctor*, 2022 WL 4585278, at *17 (citing 29 U.S.C. § 1132(a)(1)(B); *Welsh v. Burlington N., Inc., Emp. Benefits Plan*, 54 F.3d 1331, 1339–40 (8th Cir. 1995)).

Complicating this consideration here is that the Plan's disability definition transitioned from "own occupation" to "any occupation" on September 11, 2021. The

Plan does not appear to require that Conti reapply when the standard changes. As explained above, it also does not require her to supply proof separate from a request from Lincoln. The best reading of the Plan is that benefits cease when the proof no longer shows the claimant is disabled under the Plan, or when the claimant fails to provide proof following a request from Lincoln. Lincoln has not considered Conti's proof under the "any occupation" standard, nor has it terminated her claim for failing to supply proof to make that determination. Under the Plan, benefits continue until Lincoln acts.

The Plan's 24-month limitation on non-verifiable symptoms has no intervening effect. Under the Plan, "non-verifiable symptoms" only include subjective complaints that cannot be diagnosed using medically accepted methods. The 18-point trigger test has been recognized as an accepted examination for fibromyalgia diagnoses. *See Chronister*, 442 F.3d at 656 (holding that trigger point test rendered a self-reported symptoms limitation inapplicable to fibromyalgia). And Dr. Palguta diagnosed Conti's complaints of pain, fatigue, and tenderness as secondary to her fibromyalgia and consistent with her small fiber neuropathy and chronic fatigue.

The record supports finding Conti disabled for the entire "own occupation" period, as there was no significant change or improvement between July 21, 2021 and September 11, 2021—the beginning of the "any occupation" disability period. However, the record does not include sufficient evidence to determine Conti's eligibility under the "any occupation" standard. Had Conti provided the records from the SSA's determination of her disability claim, perhaps that determination could be made. But under the circumstances, it is more appropriate to remand the matter for Lincoln to determine

31

Conti's eligibility under the "any occupation" disability standard, if it so chooses.

Remand is also appropriate because the "any occupation" disability standard, as defined in the Plan, partially depends on Conti's physical capacity. Lincoln can request that Conti submit to an exam or supply the proof herself. But an "any occupation" eligibility determination cannot be made without some reference to Conti's physical capacity. To be clear, this matter is being remanded for an actual determination of Conti's eligibility based on her physical capacity to work "any" job or based on her failure to comply with a specific request from Lincoln for evidence that would facilitate the determination. Anything less would render the remand a "useless formality," which the Eighth Circuit warns against. *Welsh*, 54 F.3d at 1340 (citations omitted).

Conti will be awarded ongoing benefits until Lincoln determines her eligibility under the "any occupation" standard. Withholding benefits would reward Lincoln for its wrongful termination of Conti's eligibility in July 2021. And it would burden Conti with reconstructing her disability claim, effectively penalizing her for successfully enforcing her ERISA rights. *See Proctor*, 2022 WL 4585278, at *17 (citation omitted). Lincoln may immediately resume its process to determine whether Conti remains eligible for benefits. But until it makes that determination, it must pay Conti the benefits that continue under the Policy absent some other proper action from Lincoln.

### C.    Attorney's fees and costs

Conti seeks an award of her reasonable costs and attorney's fees. Although there is no presumption for awarding fees, a prevailing ERISA plaintiff rarely fails to receive fees. *See Starr v. Metro Sys., Inc.*, 461 F.3d 1036, 1040 (8th Cir. 2006). A decision on

costs and fees will be made after Conti files a motion with the relevant legal and factual support. Lincoln will be allowed to respond.

### D. Prejudgment interest

29 U.S.C. § 1132(a)(3)(B) permits a court to award "other appropriate equitable relief" in ERISA cases, including prejudgment interest. *Proctor*, 2022 WL 4585278, at *19 (citing *Parke v. First Reliance Standard Life Ins.*, 368 F.3d 999, 1006 (8th Cir. 2004)). Prejudgment interest should be awarded unless exceptional circumstances render such an award inequitable. *Gordon v. Nw. Airlines, Inc. Long-Term Disability Income Plan*, 606 F. Supp. 2d 1017, 1040 (D. Minn. 2009) (citations omitted). No such circumstances appear to preclude awarding prejudgment interest here.

The amount of interest is calculated by applying the rate in 28 U.S.C. § 1961 to the amounts from the months in which Conti was wrongfully denied benefits. *See, e.g.*, *Lanpher v. Metro. Life Ins.*, Civ. No. 12-2561 (JRT/JSM), 2015 WL 4920042, at *4 (D. Minn. Aug. 18, 2015); *Nelson v. Metro. Life Ins.*, Civ. No. 07-2326 (ADM/JSM), 2010 WL 153040, at *10 n.6 (D. Minn. Jan. 11, 2010). But the exact amount of interest to be awarded will be resolved after the parties meet and confer and, if agreement cannot be reached, submit briefing on the matter.

## ORDER

Based on the above, and on all the files, records, and proceedings here, **IT IS**

**HEREBY ORDERED** that:

1.      Defendant The Lincoln National Life Insurance Company's Motion for

Judgment under Fed. R. Civ. P. 52 (Doc. No. 25) is **DENIED**.

2.      Plaintiff Christina Conti's Motion for Judgment under Fed. R. Civ. P. 52

(Doc. No. 21) is **GRANTED**.

3.      Defendant is ordered to pay Plaintiff damages in the amount of all her

unpaid long-term disability benefits from July 21, 2021 to the present, in an amount to be

determined.

4.      Defendant is ordered to resume Plaintiff's long-term disability benefits

until it determines that Plaintiff is not disabled under the "any occupation" standard as

defined in the Plan or until the Plan otherwise permits termination of benefits.

5.      The parties are ordered to meet and confer to discuss the amount of benefits

owed, the reasonableness of Plaintiff's costs and attorney's fees, and the proper

calculation of prejudgment interest.

6.      If the parties agree on the amounts, the parties shall submit a joint proposed

judgment within 28 days after entry of this Order.

7.      If the parties disagree, Plaintiff is ordered to submit an affidavit

substantiating her costs and attorney's fees incurred here and a brief of no more than 10

pages establishing the legal and factual basis for her reasonable costs and attorney's fees,

the amount of benefits owed, and calculation of prejudgment interest within 28 days after

entry of this Order. Defendant may submit a responsive brief of no more than 10 pages

explaining its positions on Plaintiff's request for costs and attorney's fees, the amount of

benefits owed, and the calculation of prejudgment interest within 14 days after Plaintiff

submits her filings.


 Date: March 21, 2024                              *s/ Jerry W. Blackwell*
                                                   JERRY W. BLACKWELL
                                                   United States District Judge